# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 21-7139**

**September Term, 2022**

FILED ON: FEBRUARY 21, 2023

IOAN MICULA, ET AL.,
                APPELLEES

v.

GOVERNMENT OF ROMANIA,
                APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-02332)

---

Before: SRINIVASAN, *Chief Judge*, MILLETT, *Circuit Judge*, and TATEL, *Senior Circuit Judge*.

## J U D G M E N T

This case was considered on the record from the United States District Court for the District of Columbia, and on the briefs of the parties. The Court has afforded the issues full consideration and has determined that they do not warrant a published opinion. *See* FED. R. APP. P. 36; D.C. CIR. R. 36(d). It is

**ORDERED AND ADJUDGED** that the judgment of the United States District Court for the District of Columbia be **AFFIRMED**.

## I

In 1998, Romania adopted tax incentives to encourage investment in underdeveloped or economically "disfavored" regions of Romania. *Micula et al. v. Government of Romania*, ICSID Case No. ARB/05/20, Award, ¶ 145 (Dec. 11. 2013). Ioan and Viorel Micula invested in food and beverage production in an economically disfavored region in reliance on those tax incentives and with the reasonable expectation that, because of the purpose and structure of the tax regime and Romania's representations and conduct, the tax incentives would remain in place until at least 2009. *See id.* ¶¶ 133, 156, 166, 677 ("[T]hrough an interplay of the purposes behind the [tax

1

incentive ordinance], the legal norms, the [permanent investor certificates issued to the claimants], and Romania's conduct, Romania made a representation that created a legitimate expectation that the [tax] incentives would be available substantially in the same form as they were initially offered" until 2009.), 686 ("Romania's conduct had included an element of inducement that required Romania to stand by its statements and its conduct."), 689 ("Romanian officials also stated that investors would be compensated if the regime were repealed or fundamentally altered.").

When Romania repealed most of the tax incentives in February 2005 as part of its accession to the European Union, the Miculas initiated an arbitration proceeding seeking compensation from Romania before a tribunal of the International Centre for Settlement of Investment Disputes, under the International Convention on the Settlement of Investment Disputes between States and Nationals of Other States, March 18, 1965, 17 U.S.T. 1270, 575 U.N.T.S. 159. In December 2013, the tribunal found that Romania had failed to ensure fair and equitable treatment of the Miculas' investments and awarded them 376,433,229 Romanian lei—the equivalent of roughly $116 million—plus interest.

Since then, the Miculas have been trying to enforce that arbitration judgment. *See Micula v. Government of Romania*, No. 20–7116, 2022 WL 2281645, at *1 (D.C. Cir. June 24, 2022) ("*Micula II*"). In September 2019, the district court confirmed the arbitral award and entered final judgment in favor of the Miculas for $356,439,727, which reflected the amount of the arbitral award plus interest. Romania appealed, and this court affirmed. *Micula v. Government of Romania*, 805 F. App'x 1 (D.C. Cir. 2020) ("*Micula I*").

In March 2020, the district court granted the Miculas' motion to compel Romania to answer post-judgment interrogatories. *See* FED. R. CIV. P. 69(a)(2) ("In aid of the judgment * * *, the judgment creditor * * * may obtain discovery from any person—including the judgment debtor—as provided in these rules or by the procedure of the state where the court is located."). The interrogatories sought information about Romanian assets that could be used to satisfy the judgment.

Romania initially failed to respond, and the district court granted the Miculas' motion to hold Romania in contempt. Fourteen days after the district court issued that order, Romania submitted its initial responses to the interrogatories. Romania then amended its responses four more times. The Miculas responded with three deficiency letters that focused primarily on Romania's failure both to fully disclose its assets in the United States and worldwide and to identify assets held by all Romanian ministries or instrumentalities. After Romania failed to respond to those letters for three months, the Miculas moved in July 2021 for judgment on accrued sanctions against Romania.

Meanwhile, Romania had moved for relief from judgment under Federal Rule of Civil Procedure 60(b)(5) on the ground that it had already satisfied the judgment by paying the Miculas a lesser amount in Romanian currency pursuant to a Romanian court judgment. *See Micula II*, 2022 WL 2281645, at *1.

The district court denied Romania's motion for relief from judgment. In that same order, the

2

court granted the Miculas' motion for civil contempt and sanctions against Romania for defying the post-judgment discovery order. In doing so, the court explained that Romania could purge itself of contempt and avoid sanctions by responding to the Miculas' interrogatories within fourteen days of the order. Romania again appealed and challenged both aspects of the order (which we will refer to collectively as the "Contempt Order"). This court affirmed. *Micula II*, 2022 WL 2281645, at *1.

On November 8, 2021, while Romania's appeal of the Contempt Order was still pending in this court, the district court granted the Miculas' motion for accrued sanctions. J.A. 4414–4421. The district court found that Romania's responses to the interrogatories were "incomplete in critical ways" that materially impeded the Miculas' ability to enforce the judgment, and that Romania had failed either to object to the interrogatories or to show substantial compliance with its discovery obligations. J.A. 4419–4420. The district court then awarded $1.5 million in sanctions. The court recognized that amount was less than the $2.9 million requested by the Miculas but explained that it had imposed a lower sanction because Romania had taken some steps towards compliance with the Contempt Order. J.A. 4421.

## II

Romania now appeals the judgment granting accrued sanctions. It argues that the district court (1) lacked jurisdiction to enter the judgment while its appeal of the Contempt Order (*Micula II*) was pending before this court, (2) erred in finding that Romania had not purged its contempt by its answers to the interrogatories, and (3) wrongfully imposed sanctions instead of clarifying Romania's discovery obligations. None of those arguments succeed.

*First*, Romania's contention that the district court lacked jurisdiction to impose sanctions while *Micula II* was on appeal is incorrect. District courts retain jurisdiction to enforce their unstayed orders even while a case is on appeal. *See, e.g.*, *Horn & Hardart Co. v. National Rail Passenger Corp.*, 843 F.2d 546, 548 (D.C. Cir. 1988) (During appeal, the district court retains "inherent power to enforce its decrees and to make such orders as may be necessary to render them effective[.]") (citation omitted); *Coleman v. Tollefson*, 575 U.S. 532, 539 (2015) ("Unless a court issues a stay, a trial court's judgment * * * normally takes effect despite a pending appeal."); *In re Grand Jury Subpoena No. 7409*, No. 18–41 (BAH), 2018 WL 8334866, at *2 (D.D.C. Oct. 5, 2018) (describing precedent that a district court has jurisdiction to enforce its orders pending appeal absent a stay as "voluminous and convincing"), *aff'd sub nom. In re Grand Jury Subpoena*, 749 F. App'x 1 (D.C. Cir. 2018); Wright & Miller, § 3954 (5th ed.) ("The taking of an appeal does not by itself suspend the operation or execution of a district-court judgment or order during the pendency of the appeal.").

To be sure, in enforcing its orders, a district court cannot "alter" them while an appeal is pending. *Deering Milliken, Inc. v. FTC*, 647 F.2d 1124, 1128 (D.C. Cir. 1978); *see Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). But that principle has no application here because the district court did not alter or change in any way the content of its Contempt Order; it simply enforced its Contempt Order as written. That distinction between the enforcement of

3

orders, which is allowed, and the alteration of the content of appealed orders, which is proscribed, disposes of Romania's jurisdictional argument.

*Second*, Romania argues that the district court erred in finding that it had not satisfied the Contempt Order's purgation condition, making the order of sanctions improper. We review for an abuse of discretion the district court's finding that Romania's answers to the interrogatories were insufficient. *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, 637 F.3d 373, 379 (D.C. Cir. 2011) ("We review a district court's contempt finding and the imposed sanctions for abuse of discretion.") (citing *In re Fannie Mae Secs. Litig.*, 552 F.3d 814, 818 (D.C. Cir. 2009)).

The district court did not err in its factual finding that Romania's interrogatory answers were materially unresponsive. Federal Rule of Civil Procedure 33(b)(3) provides that "[e]ach interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." Although Romania produced several hundred pages of records, the needed substance was missing from those documents. As the district court explained, Romania's answers were "incomplete in critical ways that would enable Petitioners to enforce the judgment." J.A. 4419. For example, Romania did not (i) identify any bank account information or deny the existence of such accounts; (ii) identify any tangible assets in the United States or deny owning such assets; or (iii) provide a complete list of assets held worldwide. Nor did Romania explain why it failed either to respond "fully" or to object to the requests, FED. R. CIV. P. 33(b)(3). Because, on this record, the district court did not abuse its discretion in concluding that Romania's responses fell materially short, the court properly ruled that Romania had failed to meet the Contempt Order's purgation condition.

Nor did the district court abuse its discretion by imposing $1.5 million in sanctions. In levying roughly half of the sanction amount that the Miculas sought, the district court credited Romania for its partial responses to the interrogatories. But the court also found that Romania omitted the information most critical to satisfaction of the Miculas' judgment. Given the significant gaps in Romania's interrogatory responses and the district court's calibrated remedy, the district court did not abuse its discretion in assessing sanctions.

*Third*, Romania errs in arguing that the district court had to issue a second order to compel the specific information omitted from its interrogatory responses before issuing sanctions. *See* Romania Opening Br. 8; Romania Reply Br. 12–13.

To the extent Romania's argument is a challenge to the Contempt Order, that Order has already been affirmed by this court. *See Micula II*, 2022 WL 2281645, at *1–2. And nothing in law or logic entitled Romania to yet another round of motions and orders to compel. It had already been held in contempt, given purgation conditions, and warned of the consequences of noncompliance. There was no ambiguity in the Contempt Order's requirement that Romania answer fully the post-judgment interrogatories, which themselves left no reasonable doubt as to Romania's obligation to disclose bank accounts used to finance Romanian consular operations in the United States and real property held by Romania. Because Romania cannot plausibly claim that it lacked sufficient notice of its obligation to fully answer the interrogatories, and it failed to raise any "actual, specified objections about the scope of the requests or the burden they impose[d,]" J.A. 4419–4420, the district court did not err in imposing sanctions on Romania.

4

## III

For the foregoing reasons, the judgment of the district court is affirmed.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or rehearing *en banc*. *See* FED. R. APP. P. 41(b); D.C. CIR. R. 41(a)(1).

### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:   /s/
Daniel J. Reidy
Deputy Clerk

5